UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

TONY BENNETT,

                Plaintiff,

        v.

ERIE COUNTY HOLDING CENTER
MEDICAL DEPARTMENT

                Defendant.

<u>DECISION & ORDER</u>

03-CV-6393P

        Plaintiff Tony Bennett ("Bennett") has filed suit against the Erie County Holding Center Medical Department (the "Medical Department") under 42 U.S.C. § 1983, alleging that it was deliberately indifferent to his medical needs in violation of the Eighth Amendment.  (Docket # 1).  Pursuant to 28 U.S.C. § 636(c), the parties have consented to have a United States magistrate judge conduct all further proceedings in this case, including the entry of final judgment.  (Docket # 14).  Currently before this Court is the Medical Department's motion for summary judgment.  (Docket # 34).  For the reasons discussed below, the Medical Department's motion is granted.

## <u>FACTUAL BACKGROUND</u>

        Shortly before his admission to the Erie County Holding Center (the "Holding Center"), Bennett underwent surgery at Strong Memorial Hospital for a fractured jaw.[1]  (Docket

---

[1]  The factual recitation is based upon the Medical Department's Statement of Facts Not in Dispute submitted pursuant to Rule 56.1 of the Local Rules of Civil Procedure for the Western District of New York. (Docket # 35).  Bennett has not submitted a Rule 56.1 Statement, nor has he challenged the specific factual

# 36, Ex. A, Declaration of Nkechi Ilogu, R.N. ("Ilogu Decl.")).  Upon admission to the Holding

Center on the evening of March 27, 2003, Bennett was seen by a physician's assistant, Susan

Mascoti.  (Ilogu Decl. ¶ 6).  Ms. Mascoti noted in Bennett's medical file that he had a fractured

jaw, and she prescribed for him an antibiotic, Clindamycin, as well as Tylenol with codeine and a

peridex rinse.  (Ilogu Decl. ¶ 6).  Ms. Mascoti further proscribed recreation and ordered a clear

liquid diet; she recommended that he follow-up with a Ear, Nose and Throat ("ENT") physician

at the Erie County Medical Center ("ECMC").  (Ilogu Decl. ¶ 6).  According to Bennett's

medical records, Nurse Amy MacKinnon administered the medication to Bennett as Ms. Mascoti

had directed.  (Ilogu Decl. ¶ 6).  Bennett disputes that he was given the prescribed medicine

before being admitted to the hospital the next day.  (Docket # 43 at p. 1).

The following day, March 28, 2003, Bennett complained of severe pain and

increased swelling and was seen by Nkechi Ilogu, a registered nurse.  Nurse Ilogu recommended

that Bennett be sent to ECMC that afternoon for an evaluation by an ENT specialist.  (Ilogu Decl.

¶ 7).  Dr. Dunlop, a physician with the Medical Department, approved Nurse Ilogu's

recommendation, and Bennett was sent to ECMC, where he was admitted and remained as a

patient until April 11, 2003.  (Ilogu Decl. ¶ 7).  During his hospital stay, he was treated for a

surgical wound abscess.  (Ilogu Decl. ¶ 8).

At the time of his discharge from ECMC, Bennett's Discharge Summary noted:

> The patient was admitted to the 9th floor prisoner lock up unit,
> room 952.  The patient progressed positively on a daily basis.  The
> patient remained ambulatory.  The patient's surgical wound
> abscess was addressed by incision and drainage and subsequently

---

allegations contained in the Medical Department's Statement, other than as indicated herein.  Rather, he disputes the
conclusions to be drawn from the undisputed facts, maintaining that they demonstrate deliberate indifference.

followed by iodoform packing with daily changes of iodoform
packing along with peroxide and water cleansing of the wound
area.  The patient was placed on Clindamycin [an antibiotic] 900
mg IV q.8h., Paradox solution rinses with rinse, gargle and spit 15
cc q.i.d., Tylenol #3 . . . [every 4 hours as needed] . . . for pain.

As stated above, the patient progressed positively throughout his
stay.  Clindamycin IV was [discontinued] on 04/10/03.  The patient
was then begun on Cleocin [another antibiotic] 150 mg p.o.q.i.d.,
Tylenol #3 . . . [every 4 hours or as needed for pain] remain in
place . . ..  Would steadily healing well . . ..  Wound edges healthy.
Wound closure progressing properly and discharge completed by
04/10/03 . . .  Pain scale 5/10 without analgesia and 0/10 with
analgesia, Tylenol #3.  As of 04/09/03 the patent has been doing
well without supplemental analgesia.

(Ilogu Decl. ¶ 6; Docket # 36, Ex. C).

In addition, the Discharge Summary reflected the following discharge

instructions:

Follow up as soon as possible with Rochester Strong Memorial
Hospital, Head and Neck Surgery Department for re-evaluation
with potential repair revision of ORIF right mandibular fractures.
Discharge medications: Cleocin [an antibiotic] 150 mg p.o.q.i.d.
times 10 days, Tylenol #3 2 at p.o.q.4h.p.r.n pain as directed.
Local wound care if necessary peroxide and water half and half 3
times a day.  Due to malocclusion, the patient advised to continue
liquids and soft diet, to chew as tolerated, regular diet as tolerated.
The patient to follow up with ECMC on an acute care basis only.
Again, long term care including repair and revision of ORIF right
mandibular fractures done at Strong Memorial Hospital 03/25/03
and needs to be followed up with surgeons at Rochester General.

(Ilogu Decl. ¶ 9; Docket # 36, Ex. C).  On April 11, 2003, the Holding Center received the

Discharge Summary, which was noted and written into Bennett's medical chart.  (Ilogu Decl.

¶ 10).  In her declaration, Nurse Ilogu summarily affirms that the discharge instructions were

followed.  (Ilogu Decl. ¶ 10).  No indication exists in Bennett's medical records, however, that he

3

was ever evaluated by a surgeon at either Strong Memorial Hospital or Rochester General

Hospital despite the instruction that such "follow up" occur "as soon as possible."[2]  Indeed,

Bennett states that no surgical evaluation at Strong Memorial Hospital was facilitated by the

Medical Department.  (Docket # 43 at pp. 1-2).

On April 16, 2003, Bennett asked to speak with a doctor about the way his jaw

was healing.  Later that day, Bennett was seen by Kathleen Davidson, a registered nurse.  (Ilogu

Decl. ¶ 11).  Thereafter, on April 20, 2003, Bennett was seen by Dr. Merrill, a facility physician,

because he was experiencing increased swelling and drainage from an abscess.  Dr. Merrill

prescribed Augmentin (an antibiotic) for fourteen days, Ultram (a pain medication) for ten days

and Motrin as needed, and referred Bennett to a dentist.  (Ilogu Decl. ¶ 12).

Slightly more than two weeks later, Bennett complained of an abscess in his

mouth.  A notation in his medical records that day reflects that Nurse MacKinnon recognized that

Bennett had just completed an antibiotic regimen and had an appointment scheduled with the

ENT clinic at ECMC.  Thus, she recommended that Bennett await the appointment – a

recommendation that was reviewed and signed by Dr. Dunlop.  (Ilogu Decl. ¶ 13).  The records

do not make clear whether Nurse MacKinnon actually examined or spoke to Bennett before

making her recommendation.  (Docket # 36, Ex. B at p. 5).

Thirteen days later, on May 20, 2003, Bennett was examined at the ECMC ENT

clinic.  According to a report from the examination, Bennett was prescribed a daily dose of 2000

---

[2]  The following notation appears below the transcribed discharge instructions:

> Agree [with] above.  Stop peroxide x10 days.  ENT to see.  Inmate given 4x4
> dressing to do his own [changes].

(Docket # 36, Ex. B at p. 4).

milligrams of Augmentin XR (another antibiotic), which was provided to him, and was also advised that he could resume his regular diet. The report also instructed that Bennett should return for a follow-up appointment at the ENT clinic and "F/U [follow up] [at] Strong Hospital for repair ORIF." (Docket # 36, Ex. C at p. 6). Although there are check marks and initials next to each of the instructions (*id.*), Bennett's records contain no other indication the Bennett was examined at Strong Memorial Hospital or that the Medical Department made an appointment for him there. By contrast, the records reflect that a follow-up appointment was scheduled with the ENT clinic for June 17, 2003. (Ilogu Decl. ¶ 15; Docket # 36, Ex. B at p. 6). That appointment had to be rescheduled, however, because no transportation was available from the Holding Center on June 17th. (Ilogu Decl. ¶ 17).

On June 30, 2003, a deputy brought a small screw to the infirmary, which Bennett reported had fallen out of his mouth. The following day, Bennett was seen by Todd Roland, a physician's assistant, who determined that the screw that had fallen out (apparently from the plate that had been surgically implanted) presented no medical issues for Bennett. (Ilogu Decl. ¶ 18).

Bennett was scheduled to return to the ENT clinic on July 8, 2003, but again missed the appointment, this time because he was scheduled to appear in court that day. (Ilogu Decl. ¶ 19). On July 16, 2003, Bennett complained that he needed medicine for an infection in his mouth. Physician's assistant Mascoti attended to Bennett the next day and resumed his daily treatment of Augmentin XR 2000 mg for another two weeks. She also noted that he had a pending appointment with the ENT clinic. (Ilogu Decl. ¶ 20). Nine days later, on July 25, 2003, Bennett was seen by a dentist, Dr. Huron Hill, who prescribed 500 milligrams of penicillin every

six hours for seven days, as well as 800 milligrams of Motrin every six hours or as needed for five days.  In addition, Dr. Hill ordered that the Augmentin be continued for another two weeks. (Ilogu Decl. ¶ 21).

On September 16, 2003, Bennett complained of an open cut from his jaw surgery. He was seen later that day by Dr. Dunlop, who identified an abscess, prescribed another antibiotic, Clindamycin, and referred Bennett to the ENT clinic and a dentist.  (Ilogu Decl. ¶ 22). Bennett was thereafter examined by a dentist on October 3, 2003, and complained to him of sporadic pain.  Bennett also stated that he wanted "corrective surgery to straighten his jaw" and to close the "hole" in his face.  According to Bennett's medical records, the dentist determined that Bennett was "stable" and noted that the decision whether Bennett should have surgery was a decision to be made by an "ENT/oral surgeon at ECMC."  (Ilogu Decl. ¶ 23; Docket # 36, Ex. B at p. 10).  Bennett was examined by the ENT clinic four days later.  The clinic forwarded a report to the Medical Department indicating that Bennett's jaw fracture had healed and that the reconstructive plate was the source of his complaints.  The report further noted that Bennett was able to chew and swallow "quite well."  Dr. Dunlop and Nurse Davidson both reviewed the report.  (Ilogu Decl. ¶ 24; Docket # 36, Ex. B at p. 10).

On November 8, 2003, Bennett complained that the plate had shifted in his jaw and that green pus was draining from it.  He was seen later that day by physician's assistant Mascoti, who noted that Bennett's temperature was normal and that she was unable to drain any pus from his jaw.  Ms. Mascoti further noted that the lesion was healing well and that there was a history of the jaw shifting.  She again referred Bennett to the ENT clinic and prescribed Motrin

as needed.  The medical records do not reflect that he returned to the ENT clinic prior to his

transfer from the Holding Center in December 2003.  (Ilogu Decl. ¶ 25).

In his memorandum opposing summary judgment, Bennett claims that during his

incarceration at the Holding Center, he requested on numerous occasions that his jaw be

reconstructed.  (Docket # 43).  He further notes that upon his release from the Holding Center, he

was transferred to Riverview Correctional Facility, where he was advised by a physician that the

plates in his jaw were infected.  Bennett was thereafter transferred to Groveland Correctional

Facility, and while he was incarcerated there, oral surgery was preformed on June 17, 2004, "to

get the plates out and also to close the hole on [his] face that constantly leaked pus[] and blood."

(Docket # 43 at p. 2).  According to Bennett, these facts demonstrate that the Erie County

Holding Center was deliberately indifferent to his medical needs; as a result of that indifference,

especially, the failure to schedule necessary follow-up appointments, his chin is "offset" and may

require additional surgery.  (Docket # 43 at p. 3).


## DISCUSSION

### I.  Motion for Summary Judgment

The Medical Department moves for summary judgment, seeking the dismissal of

Bennett's claim in its entirety.  (Docket # 34).  According to the Medical Department, judgment

in its favor is warranted on two independent grounds.  First, it argues that it is not a legal entity

subject to suit, and thus is not a proper party to this case.  Second, the Medical Department

contends that Bennett has failed to adequately allege a claim for deliberately indifferent medical

care.  (Docket # 37).

A.  **Standard for Summary Judgment:**  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In reaching this determination, the court must assess whether there exist any disputed material facts and, in so doing, must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 166-67 (2d Cir. 1991).

A fact is material only if it has some effect on the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248; *Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see also Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, after which the nonmoving party must come forward with sufficient evidence to support a jury verdict in its favor; the motion will not be defeated based upon conjecture, surmise or the existence of "metaphysical doubt" concerning the facts.  *Bryant v. Maffucci*, 923 F.2d at 982 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  The party seeking to avoid summary judgment "must do more than make broad factual allegations and invoke the appropriate statute.  The [party] must also show, by affidavits or as otherwise provided in Rule 56 . . . , that there are specific factual issues that can

only be resolved at trial." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *see also Driscoll*

*v. Townsend*, 60 F. Supp. 2d 78, 80 (W.D.N.Y. 1999).

> As the Second Circuit has explained:
>
> [T]he trial court's task at the summary judgment motion stage of
> the litigation is carefully limited to discerning whether there are
> any genuine issues of material fact to be tried, not to deciding
> them.  Its duty, in short, is confined at this point to issue-finding; it
> does not extend to issue-resolution. . . .  [I]t must be kept in mind
> that only by reference to the substantive law can it be determined
> whether a disputed fact is material to the resolution of the dispute.

*Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

**B.  <u>The Medical Department is Not a Properly Named Defendant</u>:**  The only

defendant named in Bennett's Complaint is the Erie County Holding Center Medical

Department.  (Docket # 1).  The Holding Center, however, is not a separate legal entity.  Rather,

it is the correctional facility for Erie County and is managed by and under the authority of the

Erie County Sheriff.  (Docket # 36, Ex. E (Erie County Charter §§ 1504, 1505)).  Further, the

Medical Department is merely a department within the Holding Center, and neither has the

authority to sue or be sued as independent entities.  (*See* Erie County Charter; Docket # 37 at

p. 2).

In response to this motion, Bennett has acknowledged that "the Holding Center is

an administrative unit of Erie County," but indicates that he intends to amend his Complaint to

name the Erie County Sheriff as a party.  However, a review of this Court's docket reveals that

no such motion for leave to amend has been filed.  Moreover, pursuant to the Scheduling Order

in this case, the deadline for filing a motion to amend the Complaint expired on March 18, 2005.

(Docket # 20).

Even were this Court to construe Bennett's opposition as a cross-motion to amend his Complaint to name as a defendant the Erie County Sheriff, his motion should nonetheless be denied as futile.  In order to demonstrate that the sheriff is liable under 42 U.S.C. § 1983, Bennett must show that the sheriff was personally involved in the alleged constitutional deprivation.  *See Johnson v. City of Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 254 (2d Cir. 2001); *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001); *Houghton v. Cardone*, 295 F. Supp. 2d 268, 276 (W.D.N.Y. 2003).  Because Bennett has failed to allege any facts to suggest that the sheriff was personally involved in this case, suit against him in his personal capacity would be futile.  To the extent that he claims that the sheriff is liable in his official capacity, he must demonstrate that an official policy or custom was the cause of the alleged constitutional violation.  *See Monell v. Department of Social Servs. of City of New York*, 436 U.S. 658, 690-91 (1978); *Houghton v. Cardone*, 295 F. Supp. 2d at 277.[3]  Bennett has put forward no such allegations in this lawsuit, nor can this Court find any suggestion in the record that the Medical Department's alleged indifference resulted from an official policy or custom.

Accordingly, the Erie County Holding Center Medical Department is entitled to summary judgment on the grounds that it may not be held liable under Section 1983.

**C.  Bennett Has Not Alleged a Constitutional Violation:**  The Medical Department is also entitled to summary judgment on the grounds that Bennett has failed to demonstrate a genuine issue of material fact concerning whether his Eighth Amendment rights were violated.  The Eighth Amendment to the United States Constitution prohibits the infliction

---

[3]  This same standard would apply if he sued Erie County.  *Monell v. Department of Social Servs.*, 436 U.S. at 690-91.

of "cruel and unusual punishment." U.S. Const. amend VIII. In order to establish an Eighth

Amendment claim arising out of inadequate medical treatment, a plaintiff must demonstrate that

the defendant's actions or omissions amounted to "deliberate indifference to a serious medical

need." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

    According to the Second Circuit, a serious medical need exists where "the failure

to treat a prisoner's condition could result in a further significant injury or the unnecessary and

wanton infliction of pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998), *cert. denied*,

513 U.S. 1154 (1995). The court has articulated several factors to be considered when

determining whether a serious medical need exists. These factors include "[t]he existence of an

injury that a reasonable doctor or patient would find important and worthy of comment or

treatment; the presence of a medical condition that significantly affects an individual's daily

activities; or the existence of chronic and substantial pain." *Id.* (quoting *McGuckin v. Smith*, 974

F.2d 1050, 1059-60 (9th Cir. 1992)). Similarly, a cognizable claim relating to inadequate dental

care can be based upon such factors as the pain suffered by the plaintiff, the inability to engage in

usual activities or the deterioration of plaintiff's teeth as a result of lack of treatment. *See*

*Chance v. Armstrong*, 143 F.3d at 703 (citing *Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995)

(actionable claim arising from condition aggravated by three-week delay in treatment); *Hunt v.*

*Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (claim based upon plaintiff's complaint that he

was unable to eat properly); *Fields v. Gander*, 734 F.2d 1313, 1314-15 (8th Cir. 1984) (claim

properly based upon allegations that defendant ignored dental infection for three weeks)).

However, the mere "assertion of pain sensation alone, unaccompanied by any large medical

complications does not amount to a serious medical need under the Eighth Amendment."

*Livingston v. Goord*, 225 F. Supp. 2d 321, 329 (W.D.N.Y. 2002) (quoting *Inciarte v. Spears*,

1998 WL 190279, *3 (S.D.N.Y. 1998)).

        On the undisputed facts before this Court, the Medical Department has failed to

establish that Bennett did not suffer from a serious medical need.  Bennett has alleged that during

a nine-month period of incarceration, he suffered substantial and frequent pain from infection

following surgery.  Although the record is unclear whether Bennett suffered from one continuous

infection or from several infections at differing times during that period, the record is clear that

Bennett was prescribed significant quantities of antibiotics during those nine months.

Specifically, his medical records reveal that he consulted with a medical provider on twelve

separate occasions while he was incarcerated at the Holding Center and was prescribed five

different antibiotics, many of them on multiple occasions.  His medical records further reveal that

he complained of associated pain and was prescribed various pain medications, including Tylenol

with codeine, Motrin and Ultram.  *See Chance v. Armstrong*, 143 F.3d at 702 ("[a]ny person who

has spent a night tossing and turning in suffering from an abscessed tooth knows that dental pain

can be excruciatingly severe").  He further alleges that following his transfer from the Holding

Center, his reconstructive dental plates were determined to be infected and were removed.  Also

Bennett alleges that his jaw remains offset – a defect that he attributes to the Holding Center's

lack of appropriate medical treatment.  Taken together, these factual assertions[4] do not justify

summary judgment on the grounds that plaintiff's medical needs were not sufficiently serious to

give rise to an Eighth Amendment claim.

---

    [4]  The Medical Department does not dispute any of these facts, other than the conclusion that his offset jaw resulted from the Department's inadequate treatment.

That conclusion notwithstanding, the Medical Department is also entitled to summary judgment because no genuine issue of material fact exists as to whether the Medical Department was deliberately indifferent to Bennett's medical needs.  The deliberate indifference element of an inadequate medical care claim includes both an objective and subjective component.  *See Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991).  The objective component requires the court to consider whether there has been "a sufficiently serious deprivation of the prisoner's constitutional rights."  *Evans v. Manos*, 336 F. Supp. 2d 255, 260 (W.D.N.Y. 2004) (citing *Wilson v. Seiter*, 501 U.S. at 298-99).  The subjective component requires the court to consider "whether the deprivation was brought about by defendants in wanton disregard of those rights."  *Id.* (citing *Wilson v. Seiter*, 501 U.S. at 298-99).  In other words, the subjective prong addresses the question whether the defendant has acted "with a sufficiently culpable state of mind."  *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citations omitted).  Culpability depends on proof that the defendant "knows of and disregards an excessive risk to inmate health or safety; [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

The undisputed facts establish that the Medical Department was attentive to and treated Bennett's medical condition throughout the period of his incarceration at the Holding Center.  On the very day that he was taken into custody at the Holding Center, which was shortly after his surgery at Strong Memorial Hospital, he was examined by a nurse.  His discharge instructions were reviewed and transcribed into his medical records, and he was prescribed the medication indicated on those instructions (although he disputes that he actually received the

13

medication before his hospitalization the next day).  When he complained of pain and swelling the following day, he was examined by a nurse who recommended that he be transferred to a hospital for evaluation.  That recommendation was approved by a facility physician, and Bennett was taken to ECMC that day, where he was admitted and remained for two weeks.  When Bennett was discharged on April 11, 2003, his Discharge Summary noted that the wound was "steadily healing well" and that Bennett was "doing well without supplemental analgesia [pain relieving drugs]."  (Docket # 36, Ex. C).  The Medical Department reviewed and transcribed his discharge instructions, which included prescriptions for various medications, which the Medical Department administered to Bennett.

Over the course of the next eight months, Bennett apparently complained of issues relating to his jaw on seven separate occasions: April 16, April 20, May 7, June 30, July 16, September 16 and November 8, 2003.  Those complaints generally concerned pain, swelling and the manner in which his jaw was healing.  On every occasion except one, Bennett was seen by a member of the Medical Department (a physician, nurse or physician's assistant) either the day he complained or the next day.[5]  The response that he received was far from indifferent or wanton. On seven occasions during his incarceration, he was prescribed medication – often a different or stronger antibiotic and pain medication;[6] on several occasions, Medical Department officials

---

[5]  The only possible exception was May 7, 2003, when Bennett complained of an abscess.  The medical records reflect that Nurse MacKinnon evaluated his complaint, noted that he had just completed a two-week antibiotic regimen and had an appointment scheduled at the ENT clinic, and recommended that further treatment await the ENT evaluation; a facility physician reviewed and concurred with her recommendation.  The medical records are unclear, however, whether Nurse MacKinnon actually examined Bennett that day.  (Docket # 36, Ex. B).

[6]  The dates on which he was prescribed medication were March 27, April 11, April 20, May 20, July 16, July 25 and September 16, 2003.  (Docket # 36, Ex. B).

14

referred Bennett for evaluation to the ENT clinic at ECMC;[7] on two occasions, he was referred

for follow-up appointments with a dentist;[8] and, on his second day at the Holding Center, he was

promptly transferred to the hospital.  The record also discloses that when Bennett was sent to an

outside provider, such as the dentist or the ENT clinic, Medical Department personnel reviewed

the reports of those visits and generally adopted the recommendations or instructions.  For

example, on May 20, 2003, when Bennett returned from the clinic with a report that contained

illegible portions, the Medical Department telephoned the clinic to review the report and noted

the information conveyed in Bennett's medical records.  He was then prescribed the

recommended medication.

       The one issue that gives this Court pause is Bennett's contention that he was not

evaluated by a surgeon at Strong Memorial Hospital, despite instructions to the Holding Center

that such an evaluation take place.  When Bennett was discharged from ECMC to the Holding

Center in April 2003, his Discharge Summary instructed, "Follow up as soon as possible with

Rochester Strong Memorial Hospital, Head and Neck Surgery Department for re-evaluation with

potential repair revision of ORIF right mandibular fractures."  (Docket # 36, Ex. B at p. 20).

Despite the defendant's summary assertion that all the discharge instructions were followed,

Bennett's medical records contain no indication that he was ever transported to Strong Memorial

Hospital for surgical evaluation.  What the records do reflect is that Bennett was seen by the ENT

clinic on two subsequent occasions, the first of which occurred the following month.  The ENT

---

[7] Appointments were scheduled for Bennett at the ENT clinic on May 20, June 17 and October 7, 2003; he was examined at the clinic on May 20 and October 7, 2003.  (Docket # 36, Ex. B).

[8] He was seen by a dentist on July 25 and October 3, 2003.  (Docket # 36, Ex. B).

clinic staff apparently included surgeons,[9] although the records are unclear whether he was seen

by a surgeon, rather than another medical provider, at the ENT clinic.

      Plainly, Bennett had no constitutional right to be examined by surgeons at Strong

Memorial Hospital, rather than surgeons at another hospital.  *See*, *e.g.*, *Dean v. Coughlin*, 804

F.2d 207, 215 (2d Cir. 1986) (prisoner does not have constitutional right to treatment of his

choice); *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y. 1992) ("[p]rison officials have broad

discretion in determining the nature and character of medical treatment afforded to inmates")

(citing *Thomas v. Pate*, 493 F.2d 151, 157 (7th Cir. 1974), *cert. denied*, 423 U.S. 877 (1975)),

*aff'd*, 970 F.2d 896 (2d Cir.), *cert. denied*, 506 U.S. 1040 (1992).  Insofar as Bennett's claim

rests on this contention, it is rejected.  To the extent that his claim is that he was never evaluated

by any surgeon while incarcerated at the Holding Center, that claim – while more troubling – is

still insufficient to withstand summary judgment.  The question is not whether the Medical

Department complied with ECMC's discharge instructions by arranging a surgical evaluation;

nor is the question whether such non-compliance, if it could be established, amounts to

malpractice.  *See Estelle v. Gamble*, 429 U.S. at 107 (medical malpractice not cognizable under

42 U.S.C. § 1983); *Chance*, 143 F.3d at 703 ("negligence, even if it constitutes medical

malpractice, does not, without more, engender a constitutional claim").  Rather, the question is

whether the failure to arrange a surgical consultation caused substantial harm, *see*, *e.g.*, *Sealock*

*v. Colorado*, 218 F.3d 1205, 1210-11 (10th Cir. 2000); *Evans v. Manos*, 336 F. Supp. 2d  at 262,

and, if so, whether such failure constituted conduct that "involve[d] unnecessary and wanton

---

[9] This assumption derives from the report issued by the dentist who examined Bennett on October 3, 2003 that any decision concerning surgery should be made by an "ENT/oral surgeon at ECMC."  (Docket # 36, Ex. B at p. 10).

infliction of pain" or was "incompatible with the evolving standards of decency that mark the progress of a maturing society." *Estelle*, 429 U.S. at 102.

Bennett alleges that six months after being transferred from the Holding Center to a state correctional facility, surgery was performed to remove the plates and to "close the hole on [his] face." (Docket # 43 at p. 2). He appears to argue that this surgery should have been performed while he was at the Holding Center. (Docket # 43). "Although a delay in medical care can demonstrate deliberate indifference to a prisoner's medical needs, a prisoner's Eighth Amendment rights are violated only where a delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment." *Evans*, 336 F. Supp. 2d at 262 (internal citations omitted). In addition, the delay must have caused substantial harm in order to constitute a constitutional claim. *Id.*; *see also Sealock v. Colorado*, 218 F.3d at 1210-11; *Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir. 1990).

Viewing the evidence in the light most favorable to Bennett, I find that Bennett has not shown that the surgery should have been performed sooner (in fact, it was not performed until six months following his transfer from the Holding Center), or that substantial harm resulted from the delay. Although he summarily claims that his jaw is offset as a result of the Medical Department's failure to follow-up with a surgical evaluation, his medical records contain indications that he had a preexisting "malocclusion" (an imperfect positioning of the teeth when the jaw is closed). (*See* Docket # 36, Ex. D). Despite the malocclusion, the ENT clinic determined that Bennett was able to "chew and swallow quite well" several months following the initial surgery. (*See* Docket # 36, Ex. B at p. 10). He has simply offered no persuasive medical

17

evidence that surgery should have been conducted during the period of time that he was incarcerated at the Holding Center or that his offset jaw resulted from the failure to perform such surgery during that time frame. *See Napier v. Madison County, Kentucky*, 238 F.3d 739, 742 (6th Cir. 2001) ("[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed") (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994)).

Moreover, Bennett has also failed to adduce any evidence that any medical personnel employed by the Medical Department intended to cause Bennett pain by failing to arrange for a surgical consultation. Nor can this Court infer such a culpable state of mind based upon the entire record before it, which demonstrates that physicians and nurses at the Medical Department frequently examined Bennett, promptly transferred him to the hospital following surgical complications, referred him several times for evaluation by different specialists and regularly prescribed medication to treat his infection and pain. This conduct simply cannot be viewed as conduct that "involves unnecessary and wanton infliction of pain" or offends "evolving standards of decency that mark the progress of a maturing society." *Estelle*, 429 U.S. at 102. Accordingly, Bennett's failure to demonstrate the existence of a genuine issue of material fact as to the defendant's alleged deliberate indifference justifies summary judgment for defendants on this basis as well.

II.    **Motion for Appointment of Counsel**

Several weeks after responding to defendant's motion for summary judgment, Bennett moved this Court for the appointment of counsel, incorrectly noting that his case had "survived [a] motion to dismiss for summary judgment." (Docket # 48). Because summary judgment is hereby granted to the defendants, plaintiff's motion for appointment of counsel is denied as unnecessary. *See Hendricks v. Coughlin*, 114 F.3d 390, 392 (2d Cir. 1997) (among factors court should consider in deciding whether to appoint counsel is whether the indigent's claims seem likely to be of substance).

**CONCLUSION**

For the foregoing reasons, it is the decision and order of this Court that defendant's motion for summary judgment **(Docket # 34)** is **GRANTED** and plaintiff's motion for appointment of counsel **(Docket # 48)** is **DENIED**.

**IT IS SO ORDERED.**

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
       March __31__, 2006.

19